AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Indiana

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| Leslie M. Smith | ) Case No.   1:23-mj-00446-KMB |
| | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between the date(s) of        October 1, 2019 and December 3, 2022   in the county of                  Marion                in the

       Southern         District of              Indiana          , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347(a) | Heath Care Fraud |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

|  |
|---|
| /s/ Andrew Ratcliff |
| *Complainant's signature* |
| SA Andrew Ratcliff, HHS |
| *Printed name and title* |

Sworn to by the affiant in accordance with  the requirements of Fed. Rule of Criminal Procedure 4.1 by telephone.

Date:      June 7, 2023

City and state:              Indianapolis, Indiana

## AFFIDAVIT

I, Andrew Ratcliff, a Special Agent with the Department of Health and Human Services, Office of Inspector General, being duly sworn, depose and state:

### Introduction

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request search warrants and arrest warrants. I am also an "investigative or law enforcement officer" of the United States, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for the offenses enumerated in Title 18 of the United States Code.

2.      I have been employed by the U.S. Department of Health and Human Services, Office of the Inspector General (HHS-OIG) as a Special Agent (SA) since December 2021. Prior to my employment with HHS-OIG, I was a Diversion Investigator with the Department of Justice, Drug Enforcement Administration (DEA), a position I held May 2012 until December 2021. As a Special Agent, I have completed the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Basic Training Program, lasting approximately twelve weeks. Additionally, I have completed agency specific training in health care investigations through HHS-OIG's National Training and Emergency Operations Branch, Largo Maryland. As a Diversion Investigator, I completed DEA's Diversion Investigator Training program and conducted health care investigations resulting in criminal, civil, or administrative penalties related to the Controlled Substances Act. Prior to working at DEA, I was a Medicaid Fraud Control Unit Investigator in the State of Missouri where I completed training in and conducted multiple investigations involving health care fraud.

1

3.      I am currently assigned to the Southern and Northern Districts of Indiana, in the Indianapolis office of the HHS-OIG.  My duties include investigating fraud, waste, and abuse within the programs operated by HHS.

4.      This affidavit is submitted in support of a complaint for the arrest of Leslie M. SMITH ("L. SMITH"), for a violation of Title 18, United States Code, Section 1347(a) (Health Care Fraud).  It does not include every fact known to me about the investigation, but rather only those facts that I believe are sufficient to establish the requisite probable cause.  The information contained herein is based upon information provided to me by other law enforcement officers, as well as my personal observations.

## **Statutory Authority**

5.      Pursuant to Title 18, United States Code, Section 1347(a), it is unlawful for any person to knowingly and willfully execute, or attempt to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.

6.      Pursuant to Title 18, United States Code, Section 24(b), a "health care benefit program" is defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

## Background Regarding the Medicaid Program

7.      Authorized by Title XIX of the Social Security Act, Medicaid was signed into law in 1965 alongside Medicare.  All states, the District of Columbia, and the U.S. territories have Medicaid programs designed to provide health coverage for low-income people.  Although the Federal government establishes certain parameters for all states to follow, each state administers their Medicaid program differently, resulting in variations in Medicaid coverage across the country.[1]

7.      As authorized by 42 U.S.C. § 1396b, the United States, through the Department of Health and Human Services and its subcomponents, makes authorized payments to each state to jointly fund and administer the Medicaid program.  However, as mentioned above, each state administers its program differently.  In Indiana, the state agency responsible for the administration of Medicaid is the Family and Social Services Administration ("FSSA").  Indiana Medicaid provides healthcare under the umbrella of Indiana Health Coverage Programs ("IHCP").

8.      Indiana operates two models of claims submission: managed care and fee for service.  Under managed care, claims for medical services are generally submitted to a contracted health plan and paid, if appropriate, by that health plan.  Under fee for service, claims are submitted to the state and paid by the state (through its contracted administrators) to the provider.

9.      By becoming a participating provider in Medicaid in Indiana, enrolled providers agree to abide by the policies, procedures, rules, and regulations governing reimbursement.

---

1 *Program History*, Medicaid.gov, https://www.medicaid.gov/about-us/program-history/index.html (last visited January 6, 2023).

According to the IHCP Provider Agreement,[2] a provider requesting enrollment in IHCP must agree to all of the following:

a.      "To abide by the state's *Medical Policy Manual and IHCP Provider Reference Modules* as amended from time to time, as well as all provider bulletins, banner pages, and notices."

b.      "To certify that any and all information contained on any IHCP billings submitted on the Provider's behalf by electronic, telephonic, mechanical, or standard paper means of submission shall be true, accurate, and complete.  The Provider accepts total responsibility for the accuracy of all information obtained on such billings, regardless of the method of compilation, assimilation, or transmission of the information (whether by the Provider, the Provider's employees, agents, or a third party acting on the Provider's behalf, such as a service bureau).  The Provider fully recognizes that any billing intermediary or service bureau that submits billings to the FSSA or its fiscal agent contractor is acting as the Provider's representative and not that of the FSSA or its fiscal agent contractor.  The Provider further acknowledges that any third party that submits billings on the Provider's behalf shall be deemed to be the Provider's agent for the purposes of submission of the IHCP claims.  The Provider understands that the submission of false claims, statements, and documents or the concealment of material fact may be prosecuted under the applicable federal and state laws."

c.      "To submit claims that can be documented by Provider as being strictly for: (a) medically necessary medical assistance services; (b) medical assistance services actually

---

2 *IHCP Billing Provider Enrollment and Profile Maintenance Packet* (April 26, 2021), Indiana Family & Social Services Administration, https://www.in.gov/medicaid/providers/files/ihcp-billing-provider-enrollment-and-maintenance-form.pdf

provided to the person in whose name the claim is being made; and (c) compensation that Provider is legally entitled to receive."

10.     Per state and federal regulations, a patient must have a medical necessity to receive an item of durable medical equipment ("DME").  Additionally, a written order or prescription from a prescribing physician is required.  DME is defined by 405 Indiana Administrative Code 5-19-2 as "equipment that can withstand repeated use, is primarily and customarily used to serve a medical purpose, and generally is not useful to a member in the absence of illness or injury."  Examples of DME include blood sugar meters, canes, hospital beds, oxygen equipment and accessories, wheelchairs, and scooters.

**Background Regarding Oximeter Devices**

11.     Oximeter devices are noninvasive monitors that measure the oxygen saturation of blood.  A sensor, which can be placed on a finger, toe, or ear, uses light to estimate the oxygen saturation in the arterial blood.  The sensor is connected by a wire to a monitor, which then displays both the oxygen saturation and the heart rate.

12.     Home oximetry may be used to the monitor the oxygen saturation in the blood of individuals with known or suspected heart disease or many other circulatory or lung disorders.  It may be considered medically necessary to assist physicians in determining the correct flow of supplemental oxygen, monitoring changes in the oxygen saturation, and assisting with the management of home ventilators.  The units used in the home are usually small, portable, hand-held devices, though they can be larger, stationary machines.

13.     A patient can purchase an oximeter device "over the counter" (i.e., without a prescription) from a retail business, such as Walmart, CVS, or Amazon.  The cost of oximeter devices varies, and depends upon several factors, including quality, portability, reliability, and

features.  Based upon my brief review of listings on Amazon, I know that patients can purchase highly-rated oximeter devices online for approximately $30.00.

### Background Regarding Medical Billing

14.     Medical services are billed through a standardized set of codes that represent procedures, supplies, products, and services that may be provided to Medicaid members and to individuals enrolled in private health insurance programs by healthcare providers.

15.     Healthcare Common Procedure Coding System ("HCPCS") codes are used by insurers to determine the amount of reimbursement that a practitioner will receive from an insurer for a particular service.  All providers use the same codes to ensure uniformity.  Rules and regulations promulgated by the Indiana Medicaid program assign maximum reimbursement amounts allowed for various products and services according to their particular HCPCS codes. When providers bill for DME, they must include their usual and customary charge (that is, the amount that they would charge a member of the general public wishing to purchase that item of DME).

16.     Medicaid releases fee schedules detailing the maximum reimbursement amounts along with the effective date of that amount.  Providers should not bill Medicaid for the maximum billing amount for the HCPCS code associated with the particular item of DME unless the maximum billing amount allowed for the item is equal to the amount that the provider charges to the general public.

17.     As one example, billing code E0445 is the HCPCS code billed to Medicaid for an oximeter device.  Use of this code means that the device provided can be described as an "oximeter device for measuring blood oxygen levels non-invasively."

18.     Billing codes can have modifiers which further detail the level of service provided.  Continuing with the same example, claims for E0445 can be modified with the code NU.  This modifier, when submitted with this type of claim, indicates that the device provided was new equipment.

19.     According to the Indiana Professional Fee Schedule, HCPCS E0445 NU has a maximum reimbursable fee of $2,399.99 effective January 1, 2014, with no listed end date (indicating that this rate is currently in effect).[3]  According to the Office of Medicaid Policy and Planning, this maximum amount of allowed billing was determined by utilizing a provider survey and refers to a professional-grade oximeter.  These devices can also be rented through the Medicaid program and include all cords, batteries, alarms, sensors, probes, printers, and other supplies.

20.     Certain services require a provider to contact Indiana Medicaid for authorization prior to providing a service.  Prior authorization requirements are also indicated on the Professional Fee Schedule.  A provider is not required to obtain prior authorization from the program before providing an oximeter device to a patient.

## Results of the Investigation

21.     This investigation was initiated by the Indiana Attorney General's Office – Medicaid Fraud Control Unit ("MFCU") during a routine data analysis of claims submitted to the Indiana Medicaid program.  During this review, it was discovered that a DME company, HEALTHY FEET LLC, had billed for numerous oximeters for the maximum allowable amount

---

3 *IHCP Fee Schedules*, http://provider.indianamedicaid.com/ihcp/Publications/MaxFee/fee_home.asp (last visited January 6, 2023); *Professional Fee Schedule* (December 31, 2022), https://view.officeapps.live.com/op/view.aspx?src=http%3A%2F%2Fprovider.indianamedicaid.com%2Fihcp%2FPublications%2FMaxFee%2FProfessional%2520Fee%2520Schedule.xlsx&wdOrigin=BROWSELINK.

under the Indiana Medicaid program.  HEALTHY FEET is an Indiana limited liability company that is owned and operated by Dr. Damon L. Smith, DPM[4] ("Dr. Smith").

22.     A review of Indiana Medicaid claims data indicated that from approximately October 1, 2019, through December 3, 2022, HEALTHY FEET billed 232 times for procedure code E0445 NU.  As discussed above, the maximum amount allowed to be reimbursed under Indiana Medicaid for this code is $2,399.99 per device.  HEALTHY FEET submitted claims for each device in the amount of $3,500.00, but was only reimbursed the maximum allowable amount of $2,399.99.  In total, HEALTHY FEET was paid $556,797.68 for oximeter devices.  The 232 oximeter devices paid for by Medicaid allegedly went to a patient population of 214 unique Medicaid members.  In some instances, a Medicaid member was billed for more than one oximeter device during the above time frame by HEALTHY FEET.

23.     A podiatrist can legitimately bill for oximeter devices.  However, based upon my training and experience, the number of oximeter claims submitted by HEALTHY FEET, especially when considered in conjunction with the very high amount of each claim, is indicative of fraud.

24.     As noted above, providers of DME, including HEALTHY FEET, are only reimbursed by the Indiana Medicaid program for medical devices provided to patient-beneficiaries pursuant to a written order from a physician.  HEALTHY FEET was required to identify the ordering or prescribing physician when submitting claims to the Indiana Medicaid program for reimbursement.

---

4 A DPM is Doctor of Podiatric Medicine.  These types of medical practitioners diagnose and treat medical conditions affecting the foot, ankle, and related structures.  DPMs are licensed by the State of Indiana Professional Licensing Agency, Podiatric Medicine Board.

25.     Based on my training and experience, the approving medical physician for DME is usually the patient's primary care physician, or the physician assigned to the medical staff of a residential nursing facility if that is where the patient resides.  HEALTHY FEET's Indiana Medicaid claims were reviewed to determine the identity of the physicians who allegedly ordered or prescribed the oximeter devices.  Of the 232 oximeter devices paid for by Medicaid from October 2019 through January 2023, only 2 providers were listed on all claims for E0445 submitted by HEALTHY FEET, regardless of where the patient resided.  Those two physicians are Dr. Maria P. Robles, M.D. (who appears to be a doctor of internal medicine at Eskenazi Health, in Indianapolis) and Dr. David L. Tetrick, M.D. (who appears to be a doctor of internal medicine through the Community Physician Network in Noblesville, Indiana).  This is in stark contrast to the other claims submitted by HEALTHY FEET (i.e., claims for services other than E0445), for which 94 providers were listed.[5]  Based upon my training and experience, this is indicative of fraud.

26.     Investigators visited Drs. Robles and Tetrick.  These physicians provided copies of medical records for thirty-four patients, which were reviewed by investigators.  Investigators found that none of the oximeters were ordered or prescribed by these physicians.  Additionally, the medical records only identified one of the patients as being under the care of the physician during the record review period.  Therefore, thirty-three of the thirty-four patients (97%) were not even under the care of the physician who allegedly ordered the oximeter at the time the claim for service indicated.

27.     Investigators visited or telephonically interviewed twenty seven patient-beneficiaries, or their family member/care-giver, who had allegedly received the oximeter

---

5 Drs. Robles and Tetrick appear to be the top two providers of the other claims, accounting for approximately 28% of 1,201 claims.

devices from HEALTHY FEET.  None of these patients stated that they received the device as

claimed.  Most of the patients had never received an oximeter from any provider.  Only one

patient stated they received an oximeter.  That patient reported receiving an oximeter through the

mail, but did not remember who they received it from.  Six other patients personally purchased

their own oximeter using funds from private insurance benefits, but confirmed they did not

receive one from HEALTHY FEET.

28.     The chart below summarizes the patient-beneficiaries who were contacted and

their claims from HEALTHY FEET for oximeters:

| Verified Fraudulent Oximeters – Never Received or Ordered | | | | |
|---|---|---|---|---|
| Patient | Prescribing Physician on Claim | Date of Service | Paid to Healthy Feet | Oximeter Received? |
| A M | Dr. Robles | 7/10/2020 | $2,399.99 | Never had oximeter |
| B W | Dr. Tetrick | 9/1/2020 | $2,399.99 | Never had oximeter |
| B P | Dr. Robles | 4/4/2020 | $2,399.99 | Never had oximeter |
| C M | Dr. Robles | 9/10/2020 | $2,399.99 | Never had oximeter |
| C R | Dr. Robles | 1/10/2020 | $2,399.99 | Purchased own oximeter (Medline) through United Health Care |
| C H | Dr. Robles | 12/1/2020 | $2,399.99 | Never had oximeter |
| D M | Dr. Robles | 1/15/2020 | $2,399.99 | Never had oximeter |
| D N | Dr. Robles | 1/5/2020 | $2,399.99 | Never had oximeter |
| E B | Dr. Robles | 3/15/2020 | $2,399.99 | Purchased own oximeter from CVS |
| F S | Dr. Robles | 2/2/2021 | $2,399.99 | Never had oximeter |
| H M | Dr. Robles | 1/20/2020 | $2,399.99 | Purchased own oximeter through United Healthcare |
| I R | Dr. Robles | 3/10/2020 | $2,399.99 | Never had oximeter |
| R G | Dr. Tetrick | 8/1/2020 | $2,399.99 | Never had oximeter |
| J R | Dr. Robles | 12/5/2019 | $2,399.99 | Never had oximeter |
| J N | Dr. Robles | 3/2/2020 | $2,399.99 | Never had oximeter |
| J P | Dr. Tetrick | 12/1/2019 | $2,399.99 | Purchased own oximeter through Humana Pharmacy |
| K M | Dr. Tetrick | 9/9/2020 | $2,399.99 | Never had oximeter |

| L R | Dr. Tetrick | 4/1/2020 | $2,399.99 | Never had oximeter |
|-----|-------------|----------|-----------|--------------------|
| L P | Dr. Tetrick | 1/31/2020 | $2,399.99 | Purchased own oximeter through United Healthcare |
| L M | Dr. Tetrick | 10/10/2020 | $2,399.99 | Purchased own oximeter through United Healthcare |
| L K | Dr. Tetrick | 5/5/2020 | $2,399.99 | Never had oximeter |
| M R | Dr. Tetrick | 5/5/2020 | $2,399.99 | Never had oximeter |
| M M | Dr. Robles | 1/21/2020 | $2,399.99 | Never had oximeter |
| P M | Dr. Robles | 2/15/2020 | $2,399.99 | Never had oximeter |
| P O | Dr. Tetrick | 2/2/2020 | $2,399.99 | Never had oximeter |
| R S | Dr. Robles | 3/1/2021 | $2,399.99 | Never had oximeter |
| R R | Dr. Robles | 12/15/2019 | $2,399.99 | Received an oximeter in the mail, didn't request it and not aware of doctor prescribing it |
| **27** | | | **$64,799.73** | |

29.     During the course of the investigation, it was discovered that L. SMITH was employed as the Office Manager for Dr. Smith.  Dr. Smith is L. SMITH's stepson.  L. SMITH is currently in a divorce proceeding with Dr. Smith's father.  *See In Re: The Marriage of Leslie M Smith and Rickey Smith*, No. 49D14-1811-DN-043933 (Marion County Superior Court).

30.     A review of Medicaid documents revealed that payment for claims submitted by HEALTHY FEET were sent to an account at Regions Bank, with an account number ending in -8462.  The account receiving Medicaid payments for HEALTHY FEET was updated on September 2, 2014.  Prior to that date, an account at JPMorgan Chase, with an account number ending in -9535, was receiving payments for HEALTHY FEET.

31.     Investigators obtained records for both accounts.  Regions Bank account no. -8462 is not a business account.  Rather, it is a personal account owned by L. SMITH and Devin B. Smith (L. SMITH's son), with a listed address of 4821 Mallard View Lane, Indianapolis, Indiana.  The Mallard View Lane residence was L. SMITH's primary residence until on or about May 4, 2023.

11

32.    JPMorgan Chase account no. -9535 is a Chase business account that was opened April 19, 2007, under the business name HEALTHY FEET.  Dr. Smith is listed as the Member Manager.

33.    Based upon my training and experience, payments for claims by Indiana Medicaid to a health care provider are almost always electronically deposited into the provider's business bank account.  It is extremely rare for such payments to be made into a personal bank account. On the rare occasions a personal account is used, the account belongs to the provider.  I have never seen Indiana Medicaid payments be legitimately deposited into a personal account that belongs to an employee of a provider.

34.    Nonetheless, investigators considered the possibility that L. SMITH was receiving Medicaid payments on behalf of HEALTHY FEET, with the knowledge and consent of Dr. Smith, and then transferring or otherwise remitting those funds to an account owned or controlled by Dr. Smith.  Investigators determined that this is not what is occurring.  A review of the bank account records for Regions Bank account no. -8462 revealed no electronic transfers or paper checks paid in amounts that would correspond to deposits from Medicaid to either the business or personal accounts of Dr. Smith.

35.    Upon submission of electronic claims, Medicaid captures the unique Internet Protocol ("IP") address of the submitter of the claim.  Upon request, internet service providers are able to provide subscriber information for a specific IP address when given the date and time the IP address was used.

36.    Investigators obtained and reviewed IP information for claims submissions by HEALTHY FEET.  According to Medicaid, IP address 68.51.69.50 was utilized on June 15, 2022 at 8:07 AM to submit an Eligibility Inquiry, at 8:08 AM to submit an Eligibility Inquiry,

and at 8:11 AM for a Claim Submission.[6]   Investigators requested that Comcast provide information regarding IP address 68.51.69.50.  Comcast replied that the account and service address were L. SMITH at 4821 Mallard View Lane, Indianapolis, Indiana.  This means that claims were submitted to Medicaid from L. SMITH's then-primary residence.  This IP Address was used 1,188 times between August 2, 2021 and June 15, 2022 to conduct eligibility inquires (915) and claim submissions (273) to the Medicaid system.  Four other IP addresses were used between November 11, 2021 and January 21, 2022 for eligibility inquiries (29) and claim submission (4).

37.     On January 11, 2023, investigators executed search warrants at both the business address of HEALTHY FEET and L. SMITH's then-primary residence (the Mallard View Lane address).  L. SMITH initially refused to open the door for officers at the Mallard View Lane residence.  After delaying the search for over an hour, she eventually opened the door and allowed officers to enter at approximately 10:05 AM.  Investigators did not find any oximeter devices, or any records related to the purchase, sale, or transfer of oximeter devices, at either search location.

38.     As part of the search of L. SMITH's residence, officers found and seized an Apple iPhone X that was hidden in a dog kennel.  A forensic examination of the phone revealed that, at 9:57 a.m. on January 11, 2023 (i.e., while L. SMITH was refusing to open the door and officers were waiting outside to search her home), L. SMITH sent the following message to Devin, her son: "I fucked up billing through Damon's company.  I'm not sure way to do."

39.     On various dates, investigators have interviewed Dr. Smith regarding his employment of L. SMITH.  Dr. Smith stated that L. SMITH conducted all of his Medicaid

---

6  Medicaid reports that it is unable to provide information about the specific claim that was submitted by a certain IP address at a certain day and time.

billing for HEALTHY FEET.  Dr. Smith confirmed that he did not have a bank account at Regions Bank, nor had he authorized his payment information with Medicaid to be changed to Regions Bank.  When shown the Medicaid claims for pulse oximeters, Dr. Smith stated that he had not ordered any of those devices.  Additionally, Dr. Smith stated that he had not provided any pulse oximeters to patients in several years.

### Request for Sealing

40.     I request that the Court seal the warrant and the affidavit and application in support thereof, except that copies of the warrant may be maintained by the United States Attorney's Office and may be served on law enforcement officers and other government and contract personnel acting under the supervision of such law enforcement officers, as necessary to effectuate the warrant.  Premature disclosure of these documents could cause the target to flee or prepare for the arrest in a way that could jeopardize the safety of law enforcement officers or others.

[Remainder of page intentionally left blank]

**Conclusion**

41.     Based upon my training and experience, and the facts and circumstances set forth in this affidavit, there is probable cause to believe that Leslie M. SMITH has committed a violation of Title 18, United States Code, Section 1347(a) (Health Care Fraud).  I respectfully request that the Court issue a Criminal Complaint and Arrest Warrant for L. SMITH, charging her with Health Care Fraud.

Respectfully submitted,

/s/ Andrew Ratcliff
Andrew Ratcliff
Special Agent
Department of Health and Human Services
Office of Inspector General

Sworn to by the affiant in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 by reliable electronic means, specifically telephone.

Date: June 7, 2023



Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana